

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KTF/BW/DIB
F. #2024R00288

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 16, 2025

By E-mail and ECF

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v Eric Earnest, et al.
     Criminal Docket No. 25-323 (LDH)

Dear Judge DeArcy Hall:

  The government respectfully submits this letter to notify the Court of potential conflicts of interest involving Evan Corcoran, Esq., who represents the defendant Deniro Laster ("Laster"). Specifically, the potential conflicts relate to co-defendant Terry Rozier's ("Rozier") payment of Laster's attorney fees and recent public comments made by Rozier's lawyer suggesting that Rozier's defense strategy at trial will be to inculpate Laster. While the government currently does not believe—based on the limited information available to it regarding the nature and scope of these potential conflicts—that any of these potential conflicts are per se disqualifying, the government advises the Court of this information pursuant to its obligation under Second Circuit law so that the Court may conduct the appropriate inquiries pursuant to United States v. Curcio, 680 F.2d 881, 888-90 (2d Cir. 1982). See, e.g., United States v. Stantini, 85 F.3d 9, 13 (2d Cir. 1996); United States v. Malpiedi, 62 F.3d 465, 467 (2d Cir. 1995).[1]

---

[1] The government respectfully reserves the right to change its position, based on the receipt of information not yet known, regarding whether the above-described potential conflicts are per se disqualifying.

I.      <u>Relevant Background</u>

    A.      <u>The Indictment</u>

On October 16, 2025, a grand jury sitting in the Eastern District of New York returned an indictment charging Laster and Rozier, among others, with wire fraud conspiracy, in violation of 18 U.S.C. § 1349, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). <u>See</u> Indictment, <u>United States v. Earnest, et al.</u>, 25-CR-323 (E.D.N.Y.) (ECF No. 17) (the "Indictment"). As alleged in the Indictment, prior to the March 23, 2023 National Basketball Association game between the Charlotte Hornets and the New Orlean Pelicans, Rozier, who was then a player for the Hornets, informed Laster that he was going to prematurely remove himself from the game in the first quarter and not return to play further. <u>Id.</u> ¶ 36. As alleged, Rozier provided Laster this information for the purpose of enabling Laster to place wagers based on this information. <u>Id.</u>

    B.      <u>Relevant Background Regarding the Potential Conflicts</u>[2]

Rozier and Laster have been close friends since childhood. At times, Laster has lived with Rozier and has frequently travelled with Rozier to attend Rozier's games. Laster is currently self-employed and, based on his disclosure to Pretrial Services, has an estimated monthly cash flow of $200 and no additional assets. Between approximately December 2022 through May 2025, Laster was paid over $165,000 in regular payments from Rozier's company, GMB Chronicles LLC. Counsel for Laster has advised the government that Laster's legal fees are being paid by Rozier.

Since the unsealing of the Indictment on October 23, 2025, Rozier's counsel has made public comments asserting that Rozier was not involved in the charged conspiracy.[3] In these interviews, Rozier's counsel has placed the responsibility for the actions alleged in the Indictment on a friend, who appears to be Laster. For example, on October 29, 2025, Rozier's counsel stated during an interview with Fox News, "Confiding in a friend, a childhood friend and saying man it's the end of the season, we are out of the playoffs, I'll sit early in this game, that's not a crime . . . that is confiding in a friend . . . But he told a friend, and whatever that friend did is not on Terry . . . This is a situation where a friend took information, ran with it, Terry didn't do anything." On October 30, 2025, Rozier's counsel stated during an interview with CNN, "At

---

[2] The following information is based on the government's investigation and public comments made by Rozier's counsel.

[3] <u>See</u> <u>Lawyer for indicted NBA player, Terry Rozier, speaks Out</u>, CNN, <u>available at</u> https://www.cnn.com/2025/10/30/us/video/lawyer-for-indicted-nba-player-terry-rozier-speaks-out-lcl; <u>Terry Rozier's attorney says allegations are "thin,"</u> Fox News, <u>available at</u> https://www.youtube.com/watch?v=jHWaNT66jQA.

best, [Rozier] relied on a bad friend and made a comment about being banged up at the end of an 82-game season." The "friend" referenced in all of these comments appears to be Laster.

II.     Applicable Law

   A.     Overview

The Sixth Amendment affords a criminal defendant the right to effective assistance of counsel. See Wood v. Georgia, 450 U.S. 261, 271 (1981); United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003). That right, however, is not absolute and does not guarantee the defendant counsel of his own choosing. See United States v. Jones, 381 F.3d 114, 119 (2d Cir. 2004); United States v. Locascio, 6 F.3d 924, 931 (2d Cir. 1993). While there is a "presumption in favor of the [defendant's] chosen counsel, such presumption will be overcome by a showing of an actual conflict or a potentially serious conflict." Jones, 381 F.3d at 119 (citing Locascio, 6 F.3d at 931); see also Wheat v. United States, 486 U.S. 153, 164 (1988).

To determine if the defendant's counsel is burdened by a conflict of interest, a district court "must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994). An actual conflict exists "when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." Jones, 381 F.3d at 119 (internal quotation marks and citations omitted). A potential conflict arises if "the interests of the defendant could place the attorney under inconsistent duties in the future." Id. (emphasis and citations omitted).

   1.     Mandatory Disqualification

If an attorney suffers from an actual or potential conflict of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation, the court must disqualify that attorney. See United States v. Lussier, 71 F.3d 456, 461-62 (2d Cir. 1995). Such per se conflicts of interest are not only unwaivable, but are of such a serious nature that if allowed to persist through trial and conviction, on appeal they result in automatic reversal without requiring a showing of prejudice. United States v. Williams, 372 F.3d 96, 103 (2d Cir. 2004). The Second Circuit has recognized only two categories of conflicts that are unwaivable and create per se violations of the Sixth Amendment: where counsel is not admitted to the bar of any court and where counsel is implicated in the defendant's crimes. See United States v. Fulton, 5 F.3d 605, 611 (2d Cir. 1993).

   2.     Discretionary Disqualification

Regardless of the severity of the conflict or the defendant's willingness to waive the conflict, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160. "The question of [attorney] disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." Locascio, 6 F.3d at 931. Accordingly, "a district court should

3

decline to permit a defendant to be represented by the counsel of his choice if that representation would undermine the integrity of the judicial process." United States v. DiPietro, No. 02-CR-1237, 2004 WL 613073, at *4 (S.D.N.Y. Mar. 29, 2004) (citing Wheat, 486 U.S. at 163).

### 3. Conflicts That May Be Waived

If a conflict is such that a rational defendant could knowingly and intelligently choose to continue to be represented by the conflicted attorney, the Court must obtain directly from the defendant a valid waiver in accordance with the procedures set forth in Curcio, 680 F.2d 881. See, e.g., Malpiedi, 62 F.3d at 470; Levy, 25 F.3d at 153; United States v. Iorizzo, 786 F.2d 52, 58–59 (2d Cir. 1986). In summarizing Curcio procedures, the Second Circuit has instructed the trial court to:

> (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

Iorizzo, 786 F.2d at 59; see also Curcio, 680 F.2d at 888-90. By relying on waivers of potential conflict claims, courts are spared from having to wade into the intricacies of those claims. United States v. Jiang, 140 F.3d 124, 128 (2d Cir. 1998).

Finally, the need for a Curcio hearing exists regardless of whether a case is disposed of by way of guilty plea or trial. "A claim that counsel is conflicted is in essence a claim of ineffective assistance of counsel." Stantini, 85 F.3d at 15. Likewise, "[e]ffective assistance of counsel includes counsel's informed opinion as to what pleas should be entered." Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996). Therefore, it necessarily follows that a defendant has a right to conflict-free representation during the plea negotiation stage. See id. ("[P]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered." (quoting Von Moltke v. Gillies, 332 U.S. 708, 721 (1948)); see also Stantini, 85 F.3d at 16-17 (suggesting that ineffective assistance of counsel may be shown if attorney's dual representation led to inadequate advice "with respect to the advantages or disadvantages of a plea").

### 4. Rejecting Conflict Waivers

If a conflict is such that a rational defendant could knowingly and intelligently choose to continue to be represented by the conflicted attorney, the Court must obtain directly from the defendant a valid waiver in accordance with the procedures set forth in United States v. Curcio, 680 F.2d 881 (2d Cir. 1982). See, e.g., United States v. Malpiedi, 62 F.3d 465, 470 (2d Cir. 1995); Levy, 25 F.3d at 153; United States v. Iorizzo, 786 F.2d 52, 58-59 (2d Cir. 1986). However, despite a defendant's willingness to waive his attorney's conflict of interest, courts have "substantial latitude" to reject such waivers. See Wheat, 486 U.S. at 163. That is because such waiver does not necessarily cure the problems occasioned by conflicts of interest. Id. at

160. Courts "must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict." Id. at 163. As the Supreme Court explained:

> The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. . . . A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.

Id. Accordingly, the determination of whether to reject a waiver and disqualify an attorney is "left . . . to the informed judgment of the trial court," which can evaluate the facts and circumstances of the case. Id. at 164.

    B.    Specific Conflicts

        1.    Third Party Payment of Legal Fees

A conflict may arise when an attorney is paid by a third party, rather than by his or her own client.

> Ethical considerations warn against an attorney accepting fees from someone other than her client . . . [T]he acceptance of such 'benefactor payments' 'may subject an attorney to undesirable outside influence' and raises an ethical question 'as to whether the attorney's loyalties are with the client or the payor.'

United States v. Locascio, 6 F.3d 924, 932 (2d Cir. 1993) (quoting In re Grand Jury Subpoena Served Upon John Doe, Esq., 781 F.2d 238, 248 n.6 (2d Cir. 1986) (en banc)); see also Wood v. Georgia, 450 U.S. 261, 269–70 (1981) ("Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party."); United States v. Wells, 394 F.3d 725, 733–34 (9th Cir. 2005); United States v. Arakelian, No. 04-CR-447, 2005 WL 2173923, *6–7 (S.D.N.Y. Sept. 6, 2005) (describing Curcio-related inquiry related to potential benefactor payments); Moreno-Godoy v. United States, 13-CV-2383, 2014 WL 1088300, at *32 (S.D.N.Y. Mar. 20, 2014) ("A conflict of interest

5

can arise where a third party's payment of a defendant's attorney's fees leads to a 'theoretical division of loyalties.'") (quotations omitted).[4]

"By their very nature, third-party fee arrangements create numerous ethical pitfalls into which even the most wary criminal defense attorney may stumble." United States v. Duran-Benitez, 110 F. Supp. 2d 133, 151–52 (E.D.N.Y. 2000) (citing New York Disciplinary Rules). See Restatement § 134(1) ("A lawyer may not represent a client if someone other than the client will wholly or partly compensate the lawyer for the representation, unless the client consents . . . and knows of the circumstances and conditions of the payment."); N.Y. Rules of Prof. Conduct 1.8(f) (2025) ("A lawyer shall not accept compensation for representing a client, or anything of value related to the lawyer's representation of the client, from one other than the client unless: (1) the client gives informed consent; (2) there is no interference with the lawyer's independent professional judgment or with the client-lawyer relationship; and (3) the client's confidential information is protected[.]"). "These ethical pitfalls become especially dangerous when a defendant's lawyer is hired and paid by 'the operator of the alleged criminal enterprise.'" Duran-Benitez, 110 F. Supp. 2d at 152 (quoting Wood, 450 U.S. at 269). In such situations, the Supreme Court wrote in Wood, there exists a "risk that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest." Wood, 450 U.S. at 269; see also In re: Grand Jury Subpoena Served Upon John Doe, Esq., 781 F.2d at 248 n.6 (noting that when "the third party is the head of a criminal enterprise of which the clients are members . . . an ethical question arises as to whether the attorney's loyalties are with the client or the payor").

The Second Circuit has recognized that a law firm's financial interests to a third party can create an unwaivable conflict of interest. In United States v. Schwarz, 283 F.3d 76, 81, 91-92 (2d Cir. 2002), the Circuit reversed the trial conviction of a defendant because his attorney's interest in maintaining a lucrative retainer agreement from the third party paying the defendant's legal fees constituted an actual, unwaivable conflict of interest. In Schwarz, the defense attorney represented at trial a police officer who had been charged with conspiring to obstruct justice concerning the assault of a victim. Id. at 81. At the same time, the attorney's firm had also entered into a $10 million retainer agreement with a police union to represent all police officers in administrative, disciplinary and criminal matters, and also to provide civil legal representation, which could be cancelled at any time at the union's discretion. Id. at 91. Because the trial defendant had an interest in implicating a third party in the assault—whereas the union did not—and at trial that strategy was not pursued, those diverging interests, coupled with the firm's financial interest with the union created an actual conflict, which compromised the attorney's representation of the trial defendant. Id. at 92, 96–97.

\* \* \* \* \*

---

[4] "[A]bsent special circumstances . . . disclosure of fee information and client identity is not privileged." In re Grand Jury Subpoena Served Upon John Doe, Esq., 781 F.2d at 248.

In cases where, as here, multiple conflicts have been raised, the district court must consider the conflicts in totality, and not in isolation. See Levy, 25 F.3d at 157.

III.   Analysis

Because a third party (Rozier) is paying Laster's legal fees in this case, it is possible that Laster's counsel faces a potential conflict of interest. The potential conflict is compounded by the fact that Rozier is a co-defendant who, based on his attorney's public comments, is blaming Laster for Rozier's indictment and is likely to assert a defense in court that is contrary to Laster's interests. These circumstances pose real "inherent dangers" in that the payment of legal fees by a third party and co-defendant "may subject an attorney to undesirable outside influence" and raises an ethical question "as to whether the attorney's loyalties are with the client or the payor." Locascio, 6 F.3d at 932.

The primary concern is that this payment structure creates an obvious incentive for the attorney's divided loyalties between (*i*) his client Laster and (*ii*) the person paying his legal fees, co-defendant Rozier, particularly in light of Rozier's attorney's public comments placing the blame on a "friend" who is almost certainly Laster. This structure has the potential to affect Laster's counsel's advice, including with respect to, for example: (1) whether to plead guilty and how to allocate; (2) what defense theory to assert; (3) whether to seek possible leniency by cooperating with the government, including against Rozier, and (4) whether to testify in his own defense at trial, where such testimony might implicate Rozier. See, e.g., Wood, 450 U.S. at 270 ("One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest."); Amiel v. United States, 209 F.3d 195, 198–99 (2d Cir. 2000) (reasoning that if trial counsel advised defendant not to testify even though testifying was in the best interests of the defendant, to avoid inculpating the payor of counsel's fees, "these facts . . . would entitle appellant to relief [on an ineffective assistance claim] on the ground that trial counsel abdicated his duty of loyalty by permitting a third party who paid his fees to influence his professional judgment in representing [the defendant]" (citations omitted)); Wood, 450 U.S. at 270 ("Another kind of risk is present where, . . . the party paying the fees may have had a long-range interest in establishing a legal precedent and could do so only if the interests of the defendants themselves were sacrificed.").[5] In addition, based on his disclosure to Pretrial Services, it is not clear what alternative funds Laster has to pay for his attorney.

---

[5]   See United States v. Bernstein, 533 F.2d 775, 788 (2d Cir. 1976) ("Since the codefendants were underwriting Behar's defense, this readily apparent conflict could be seen by the court to indicate a significant probability of prejudice. The freedom of the attorney, whether in cross-examination or assertion of the defense of lack of authority, could have been inhibited and a full and uncompromised defense of his clients' interests have been seriously impaired. While neither Judge Travia nor this court in any manner questioned the integrity of Mr. Boitel or his assurance that he would give Behar full and proper representation regardless of who was paying him, the court had a special duty to make certain that any waiver was knowingly and intelligently made.").

Therefore, a <u>Curcio</u> inquiry is appropriate to determine, as to Laster, (i) whether the payment of his legal fees by Rozier presents a conflict; (ii) the nature and extent of that conflict; and (iii) whether Laster is willing and able to make a knowing and voluntary waiver of the conflict. During a <u>Curcio</u> hearing, the court should also remind Laster that he is entitled to conflict-free counsel whose loyalty lies solely to him and, if he cannot afford counsel, he need not rely on a co-defendant to pay his legal fees because counsel will be provided to him free of charge by the Court.

\* \* \* \* \*

While the government currently does not believe—based on the limited information available to it regarding the nature of the above-described potential conflicts of interest—that any of these potential conflicts are <u>per se</u> disqualifying, a <u>Curcio</u> hearing is necessary to ensure that the Laster is apprised of the potential conflicts and that he make a knowing waiver to the extent he wish to continue with present counsel. To the extent additional conflicts of interest become apparent, the government will promptly notify the Court.

IV.    <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court appoint <u>Curcio</u> counsel for Laster, with whom he may consult concerning the potential conflicts raised above. Thereafter, the government requests that the Court advise Laster of his rights to conflict-free representation and determine if he waives those rights. The government has enclosed herewith proposed examinations as to each potential conflict presently identified.

       Respectfully submitted,

       JOSEPH NOCELLA, JR.
       United States Attorney

By: *Benjamin Weintraub*
       Kaitlin T. Farrell
       Benjamin Weintraub
       David I. Berman
       Assistant U.S. Attorneys
       (718) 254-7000

Enclosure

cc:    Clerk of Court (LDH) (by ECF)
      Counsel of Record (by ECF)