JPL:KTF/BLW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

ERIC EARNEST,
     also known as "Spook,"
MARVES FAIRLEY,
     also known as "Vez," "Vezino"
     and "Vezino Locks,"
SHANE HENNEN,
     also known as "Sugar,"                    25-CR-323 (LDH)
DAMON JONES,
     also known as "D Jones" and
     "Dee Jones,"
DENIRO LASTER,
     also known as "Niro," "Payso"
     and "Peso," and
TERRY ROZIER,
     also known as "Scary Terry" and
     "Chum,"

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT ROZIER'S MOTION TO DISMISS THE INDICTMENT

                              JOSEPH NOCELLA, JR.
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

Kaitlin T. Farrell
Benjamin Weintraub
David Berman
Assistant U.S. Attorneys
(Of Counsel)

PRELIMINARY STATEMENT

Defendant Terry Rozier's attempt to dismiss this case on the basis of <u>Ciminelli v. United States</u>, 598 U.S. 306 (2023), is misplaced.  Contrary to Rozier's assertions, this case is not about exotic theories of property or the "right to control" information.  Nor is it about criminalizing conduct traditionally policed by the states.  This is a case in which the defendants engaged in a nationwide scheme to lie and cheat to steal money, and used the interstate wires to do so.  As such, the indictment alleges a classic wire fraud theory (and companion money laundering theory) premised on conduct that is plainly prohibited by federal criminal law.  This Court should reject the defendant's attempts to rewrite the indictment to allege a theory that exists nowhere in this case, and deny the motion to dismiss.

I.    <u>Background</u>

    a.    <u>The Indictment</u>

        The indictment alleges a nationwide scheme in which the defendants and their co-conspirators agreed to use non-public information about professional athletes' anticipated or preplanned underperformance or non-participation in NBA games; lie about it so they could fraudulently obtain money from betting operators, including sportsbooks; and then launder that money.  <u>United States v. Earnest</u>, 25-CR-323, ECF Dkt. No. 1 ("Indictment" or "Ind.") at ¶¶ 30-34, 64, 66.  One of several schemes comprising the conspiracy—focused on here for the

purposes of responding to this motion to dismiss—revolved around the defendant Terry Rozier ("Rozier").  Id. ¶¶ 36-43.[1,2]

Rozier is, and was during the conspiracy, a professional basketball player.  Id. ¶ 6. He was trained annually by the NBA that, as a player with access to confidential betting information, he was prohibited from sharing any confidential information about NBA games or players with anyone involved in gambling on NBA games.  Id. ¶ 7.  Nevertheless, in the Spring of 2023, he informed his childhood friend and repeat sports gambler Deniro Laster ("Laster") that he intended to withdraw himself early from an upcoming game, and later specified the game would be on March 23, 2023 (the "March 23 Game"), so that Laster and co-conspirators could place bets on the information.  Id. ¶ 36.  In exchange for a kickback of expected gambling profits, Laster disseminated their plans to a network of bettors within the conspiracy—first that Rozier intended to withdraw early from an upcoming game, and then the specific game from which Rozier planned to pull himself—which network placed a variety of bets on Rozier's underperformance for that game.  Id. ¶ 37.  The bettors within the conspiracy agreed to (and did) kick money back up the chain of information.  Id. ¶¶ 34, 42, 66.

Prior to the March 23 Game, despite the plan to remove himself prematurely, Rozier was not on the injury report; the betting lines for proposition bets, or "props," on Rozier's performance were accordingly in line with Rozier's season averages.  Id. ¶ 36.  When placing

---

[1] The basic principles of sports gambling are explained in the Indictment and familiarity with such principles is assumed for the purposes of this motion response.  See id. ¶¶ 22-29.

[2] Most of the facts contained herein are alleged in the Indictment as cited; additional facts which the government intends to prove at trial are included in response to certain of the defendant's arguments.  By providing additional facts herein, the government in no way limits the evidence that it may seek to introduce at trial.

under bets in anticipation of Rozier's early withdrawal from the March 23 Game, the co-conspirators affirmatively lied to betting operators, including the betting companies identified in the Indictment (the "Betting Companies"):  In order to place a bet with any of the Betting Companies that were defrauded in the defendants' schemes, the bettors were required under the respective terms of service to warrant at the time of placing the bet that they were not misusing inside information.  Id. ¶¶ 24, 30-32.  Below is just one example of many such misrepresentations that were the means of accomplishing the defendants' fraud:

- Timothy McCormack ("McCormack")—one of the straw bettors and co-conspirators whom Your Honor has already sentenced, including for his conduct in this scheme—wagered on Rozier's unders via Betting Company 1's online sportsbook on March 23, 2023 in connection with the March 23 Game and won many of his bets.  Id. ¶ 39(b).

- McCormack agreed to Betting Company 1's operative terms of use on March 11, 2023, which provided that, "It is a condition of our acceptance of Bets from you, and by offering to place a Bet with us you represent and warrant, that . . . you are not misusing Inside Information to place a Bet." Betting Company 1's New Jersey Terms and Conditions as of Feb. 21, 2023 § 8.17.  The terms of use define "Inside Information" as "any information which has not been made public and, if it were made public, would be likely to have a material effect on the relevant market relating to the event."  Id. § 8.22.

- By placing the bet on Rozier's unders on March 23, 2023 with Betting Company 1, McCormack represented and warranted at the time he made the bet that he was not misusing "any information which has not been made public and, if it were made public, would be likely to have a material effect on the relevant market relating to the event."  Id.  This was false. Consistent with the allegations in the Indictment, the purpose of this lie was to defraud Betting Company 1 of its money.  Ind. ¶¶ 30-32, 64.

As planned among the co-conspirators, Rozier removed himself from the March 23 Game in the first quarter and did not return.  Id. ¶ 41.  As a result of his premature withdrawal, Rozier underperformed significantly with respect to his per-game averages of points, assists and three-pointers and below the lines set by oddsmakers for the March 23 Game.  Id. Rozier, however, collected four rebounds, which was above the line set by oddsmakers.  Id.

Because Rozier went over on his rebounds, any parlay bets placed by the co-conspirators on Rozier's unders that included rebounds as a leg of the parlay lost. Regardless, many of the co-conspirators' bets still won and the co-conspirators fraudulently obtained from the Betting Companies over $100,000 in profits on the March 23 Game. Id.

Approximately five days after the March 23 Game, Laster and a friend traveled to Philadelphia, Pennsylvania to pick up tens of thousands of dollars in cash from a co-conspirator, which money represented the kickback for the inside information Laster and Rozier had provided. Id. ¶ 42. Rozier arranged and paid for the flights to Philadelphia and offered to pay for the car Laster rented to drive back overnight from Philadelphia to Rozier's house in Charlotte, North Carolina while carrying the cash. Id. The night after Laster arrived in Charlotte with the illicitly obtained cash, Laster and Rozier counted the cash together at Rozier's home. Id. ¶ 43.

b. The Defendant's Motion

In his motion to dismiss, defendant Rozier claims that the Supreme Court's decision in Ciminelli v. United States, 598 U.S. 306 (2023) renders the Indictment defective and warrants dismissal. Viewed in the most charitable light, the defendant appears to argue that Ciminelli's holding that the "right to control valuable economic information necessary to make discretionary economic decisions" is not a proper object of a wire fraud conspiracy prosecution should be extended to this case because the Indictment alleges that the means by which the defendants perpetrated their fraud included providing false and misleading information to the sportsbooks. See id. at 2. This claim is facially irreconcilable with Ciminelli; the wire fraud statute; and every post-Ciminelli case of which the government is aware, including United States v. Timothy McCormack, 24-CR-490, in which the Court recently sentenced McCormack to 24

4

months' imprisonment on an identical wire fraud theory. The defendant's arguments should be rejected.

II.     Applicable Law

       a.     Legal Standard for a Motion to Dismiss an Indictment

      Federal Rule of Criminal Procedure 12 states that a defendant may move before trial to dismiss an indictment that lacks "specificity" or "fail[s] to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). "The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." United States v. Raniere, 384 F. Supp. 3d 282, 299 (E.D.N.Y. 2019) (quoting United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001)). In evaluating a motion to dismiss, the Court "accept[s] as true all of the allegations of the indictment." United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985).

      An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). But in order "to satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Stringer, 730 F.3d 120, 124 (2d Cir. 2013) (internal quotation marks and citation omitted). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Id. (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)). "[T]he indictment need only allege the 'core of criminality' the Government intends to prove at trial, since the indictment is 'read . . . to include facts which are necessarily implied by the specific

allegations made.'"  United States v. Budovsky, No. 13-CR-368 (DLC), 2015 WL 5602853, at

*3 (S.D.N.Y. Sept. 23, 2015) (alteration in original) (quoting United States v. Rigas, 490 F.3d

208, 229 (2d Cir. 2007)); see also United States v. Faison, 393 F. App'x 754, 757 (2d Cir. 2010);

United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002)).  "The core of criminality of an

offense involves the essence of a crime, in general terms; the particulars of how a defendant

effected the crime falls outside that purview."  United States v. D'Amelio, 683 F.3d 412, 418 (2d

Cir. 2012) (citation omitted).  When reviewing an indictment for sufficiency, "common sense

must control."  United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992); see also United

States v. Torres, 191 F.3d 799, 805 (7th Cir. 1999) (noting that a court must review an

indictment "as a whole, rather than in a hypertechnical manner") (quotation marks omitted).

      b.  Background on the Wire Fraud Statute and Ciminelli

      The wire fraud statute makes it a federal crime to use interstate wire, radio, or

television communications to defraud someone of either money or property (or both).  See 18

U.S.C. § 1343.  Focusing on the property prong, the Supreme Court has issued series of opinions

clarifying what constitutes a property interest that may be vindicated by the wire fraud statute.

As reiterated most recently in Ciminelli, the Court has repeatedly emphasized that a "classic"

wire fraud charge resting on a deprivation-of-property theory must involve deprivation of a

traditional property interest.[3]  Non-traditional property interests the deprivation of which cannot

---

[3] In addition to a "classic" wire fraud theory, like the one alleged in this
Indictment, Congress has also authorized an honest-services wire fraud theory, in which it is
illegal to execute a scheme to deprive a victim of their "intangible right of honest services"
through, as subsequently narrowed by the Supreme Court, bribery or kickbacks.  18 U.S.C.
§ 1346; Skilling v. United States, 561 U.S. 358 (2010).  Although the defendant relies on at least
one honest-services case in support of his argument, see Def. Mot. at 8 (citing McNally v. United
States, 483 U.S. 350 (1987)), the government does not allege an honest-services theory here, and
such cases are irrelevant to this motion.  See, e.g., Kousisis v. United States, 605 U.S. 114, 122
n.3 (2025) (noting the irrelevance of McNally to disputes regarding a classic wire fraud theory).

be prosecuted through the wire fraud statute include a government's regulatory power, e.g.,

Kelly v. United States, 590 U.S. 391, 400 (2020); Cleveland v. United States, 531 U.S. 12, 20

(2000), and potentially valuable economic information necessary to make discretionary

decisions, commonly referred to as the "right to control," Ciminelli, 598 U.S. at 309.  The

prototypical "right-to-control" case involved a rigged bid or some other corrupt process where

the victim ultimately received the services it contracted for at the price it contracted for.  Id.  The

object of such schemes was not to deprive the victim of money or property, but rather to deprive

the victim of information to make discretionary economic decisions (for example, that the victim

should not choose the vendor because the process was corrupt)—which the Supreme Court

ultimately held is insufficient to support a violation of the wire fraud statute.  Id.

By contrast, contracts can constitute a traditional property interest.  See Ciminelli,

598 U.S. at 317 (Alito, J., concurring) (noting that nothing in Ciminelli would prevent the

government from retrying the same defendant on the theory that he deprived the victim of

"valuable contracts").  So, too, is confidential business information.  Carpenter v. United States,

484 U.S. 19, 25 (1987) (the Wall Street Journal's confidential pre-publication information

constituted property).

Importantly, a wire fraud charge is appropriate where misinformation is the means

of accomplishing the fraud rather than the object of the fraud (as was the case in Ciminelli).

Thus, in Kousisis v. United States, 605 U.S. 114 (2025), the Supreme Court recently held that a

scheme in which a defendant seeks to deprive a victim of a traditional property interest by

making a misrepresentation that is core to the benefit of the parties' bargain—i.e., a material

lie—may be prosecuted under the wire fraud statute irrespective of any actual loss to the victim.

Id. at 123.

Notably, all of the Supreme Court cases described above addressed a wire fraud theory resting on a deprivation of <u>property</u>.  Schemes in which the object is to deprive a victim of <u>money</u> do not require analysis of whether something is a traditional property interest, since the protection against money deprivation is clear from the plain language of the statute.

Consistent with that, district courts considering challenges to indictments and convictions post-<u>Ciminelli</u> have routinely rejected the argument that <u>Ciminelli</u> applies to cases alleging that the object of the conspiracy was money.  See <u>United States v. Griffin</u>, 76 F.4th 724, 738 & n.16 (7th Cir. 2023) (indictment alleging that Small Business Administration "incurred losses" that it would not have incurred but for defendants' misrepresentations was proper post-<u>Ciminelli</u> because it properly alleged a scheme to obtain money); <u>United States v. Runner</u>, No. 18-CR-578 (JS), 2023 WL 3727532, at *2 (E.D.N.Y. May 30, 2023) (finding <u>Ciminelli</u> inapposite to indictment alleging that defendant "intended to and tangibly harmed victims by causing money and personal property to be sent" to defendants);  <u>United States v. Bankman-Fried</u>, 680 F.Supp.3d 289, 305 (S.D.N.Y. 2023) (rejecting defendant's contention that indictment failed to properly alleged bank and wire fraud post-<u>Ciminelli</u> where indictment alleged that defendant "conspired to obtain money or property in violation of the statute") (internal quotations omitted);  <u>United States v. Hayman</u>, No. 23-CR-307 (MAK), 2023 WL 5488429, at *7 (E.D. Pa. May 11, 2023) (rejecting claim that <u>Ciminelli</u> barred defendant's prosecution for fraudulently obtaining vacant lots from the city because "[r]eal estate and money are traditional property interests").

8

III.       Argument

    a.   <u>Ciminelli</u> is Inapposite Because the Indictment Clearly and Properly Alleges that
Money Was the Object of the Defendants' Fraudulent Scheme

The Indictment clearly alleges a deprivation of money as the object of the

defendants' conspiracy.  Stated plainly, the defendants agreed to, and did, lie and cheat in order

to obtain money from the Betting Companies.  <u>See</u> Ind. ¶ 30 (the defendants "participated in a

scheme to defraud the Betting Companies by providing, obtaining and using non-public

information relating to NBA games to place and cause others to place fraudulent sports wagers

for profit, and to launder the proceeds thereof"); <u>cf.</u> <u>Kousisis</u>, 605 U.S. at 123 ("[P]etitioners

devised a scheme to obtain contracts through feigned compliance . . . . Their goal?  To obtain

money (tens of millions of dollars) from [the victim].  And how?  By making a number of false

or fraudulent representations." (cleaned up)).  Because money, and not some exotic notion of

property, is at issue here, <u>Ciminelli</u> is inapposite.  So, too, is the grab-bag of pre-<u>Ciminelli</u> "right-

to-control" cases the defendant cites which are no longer good law.  <u>See</u> Def. Mot. at 10 (citing

<u>United States v. Percoco</u>, 13 F.4th 158 (2d Cir. 2021); <u>United States v. Calderon</u>, 944 F.3d 72

(2d Cir. 2019); <u>United States v. Lebedev</u>, 932 F.3d 40 (2d Cir. 2019); <u>United States v. Binday</u>,

804 F.3d 558 (2d Cir. 2015)).

        The defendant attempts to sidestep both the explicit language in the Indictment

and the weight of the authorities cited above by claiming that "the indictment's characterization

of the fraud is that the scheme deprived the sportsbooks of making informed decisions of

accepting certain wagers because they were unaware that Terry Rozier informed [co-defendant

Deniro] Laster of . . . non-public information" that Rozier was planning to withdraw early from a

game. Def. Mot. at 2.  But nowhere does the Indictment allege that the defendants conspired to

deprive the Betting Companies of potentially valuable economic information necessary to make

9

discretionary decisions, as was the case in Ciminelli.  While the defendants certainly lied about their access to inside information to accomplish their fraud, there is no allegation that depriving the Betting Companies of such information was the object of their fraud.  Rather, the object of the defendants' conspiracy was the Betting Companies' money, which the Betting Companies paid the defendants and their co-conspirators for their fraudulently placed winning bets.

Put another way, the fact that the means of the conspiracy involved using non-public information and making false representations says nothing at all about whether the conspiracy's object is properly alleged under Ciminelli.  See Kousisis, 605 U.S. at 123; Runner, 2023 WL 3727532, at *2 ("Defendant cannot use Ciminelli as a shield to prevent the Government from introducing the misrepresentations or omissions underlying the alleged scheme to defraud under the guise of construing those same deceptions as exclusively relevant to . . . mere information to render them unactionable.") (internal quotations omitted); United States v. Taylor, No. 19-CR-303 (RBW), 2023 WL 5417247, at *8 (W.D. Pa. Aug. 22, 2023) (Ciminelli is "irrelevant" to case where government alleged that defendant provided false "pretenses, representations and promises" in order to obtain money and lines of credit that he then used to purchase automobiles, both of which were proper objects of wire fraud schemes). Indeed, the defendant's argument that anything could be improper about alleging a scheme accomplished through, among other things, "mak[ing] materially false and misleading statements and representations to the Betting Companies," Ind. ¶ 32, is irreconcilable with the wire fraud statute's explicit proscription against "obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1343.

b. *Ciminelli* Did Not Create a New Reverse-Preemption Basis for Dismissal

The defendant also appears to claim that Ciminelli created a reverse-preemption

scheme in which district courts may dismiss wire fraud indictments because they touch on

industries regulated by the States.  Def. Mot. at 11-14.  This does not withstand a modicum of

scrutiny and should be rejected by this Court.

In Ciminelli, the Supreme Court observed that "the right-to-control theory vastly

expand[ed] federal jurisdiction without statutory authorization . . . [b]ecause the theory treats

mere information as the protected interest" and therefore "almost any deceptive act could be

criminal."  Ciminelli, 598 U.S. at 315.  The Court thus reminded lower courts that "absent a clear

statement by Congress, courts should not read the mail and wire fraud statutes to place under

federal superintendence a vast array of conduct traditionally policed by the States."  Id. at 315-16

(cleaned up).  The defendant relies on this guidance to now suggest that any federal wire fraud

prosecution relating to a state-regulated industry should be preempted.

But such an approach would subvert Congress's "clear statement" in the plain

language of the wire fraud statute, which imposes no such blanket limitation on its enforcement.

18 U.S.C. § 1343.  The federal wire fraud statute is not displaced merely because a state has

chosen to regulate the underlying industry.  The wire fraud statute is a statute of general

applicability, designed to protect the integrity of interstate wires and to criminalize schemes to

defraud that use those wires, regardless of the substantive field in which the fraud occurs.  See,

e.g., United States v. Trapilo, 130 F.3d 547, 552 (2d Cir. 1997) ("The statute reaches any scheme

to defraud involving money or property, whether the scheme seeks to undermine a sovereign's

right to impose taxes, or involves foreign victims and governments.").  Of note, the defendant

fails to cite a single case in which a court has created an exemption from federal fraud laws

based on the existence of a state regulatory framework—whether governing gambling, insurance, or any other state-regulated industry.  To the contrary, so long as the government proves the elements of the crime, federal jurisdiction is proper even if the conduct also implicates state regulatory concerns.  E.g., United States v. Rubin, 743 F.3d 31, 34 (2d Cir. 2014) (gambling); United States v. Battista, 575 F.3d 226, 228 (2d Cir. 2009) (gambling); United States v. Rybicki, 354 F.3d 124, 127 (2d Cir. 2003) (insurance); United States v. Peterson, 896 F. Supp. 2d 305, 319 (S.D.N.Y. 2012) (insurance).  State regulation may define the lawful contours of an industry, but it does not immunize deceptive schemes operating within that industry from federal criminal liability under 18 U.S.C. § 1343.

Ciminelli did not create new law offering a reverse-preemption basis for dismissal of an indictment.  An indictment is sufficient if it tracks the statutory language, sets forth the essential elements of the offense, and fairly informs the defendant of the charges to be defended against.  Thus, defendants' policy-based objections provide no basis for dismissal.

c.  The Indictment Alleges a Conspiracy In Which the Defendants Agreed to Lie to Defraud the Betting Companies Out of Their Money

The defendant alternatively argues that, even if the government is not relying on a "right-to-control" theory of liability, the Indictment should be dismissed because the government "failed to allege any cognizable misrepresentation or omission."  Def. Mot. at 14.  Not true.  The allegations of the Indictment clearly set forth the conspiracy theory on which the defendant is charged.

An indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  Stavroulakis, 952 F.2d at 693.  Mere use of the word "fraud" to describe a defendant's conduct is sufficient to allege a material misrepresentation.  See United States v. Klein, 476 F.3d 111, 113 (2d Cir.

2007), as corrected (Mar. 8, 2007) ("[A]n allegation of materiality can be inferred from use of the word fraud in the indictment . . . . [A]s commonly understood among both lawyers and laypersons, 'fraud' refers to conduct or speech intended to mislead the putative victim into parting with money or property." (internal citation omitted)).  And where, as here, an indictment charges only a conspiracy to commit a federal offense, it need not allege the conspiracy with the same "technical precision" and "detail" as would be required in an indictment if the object offense had been charged.  Wong Tai v. United States, 273 U.S. 77, 81 (1927) (indictment for conspiracy to violate Opium Act sustained where charge provided reasonable particularity as to time, place, identity of co-conspirators, object crime, and overt acts); see United States v. Bidloff, 82 F. Supp. 2d 86, 91 (W.D.N.Y. 2000) (rejecting motion to dismiss in which defendants argued the indictment failed to state the specific false pretenses made by each defendant and instead asserted only statutory language in conclusory form; because the government charged a conspiracy, such specificity was not required).  A conspiracy indictment "is sufficient if the allegation of the scheme to defraud provides sufficient details as to the fraudulent nature of the scheme without alleging specifics of the fraudulent misrepresentation." Bidloff, 82 F. Supp. 2d at 91 (citing United States v. Wydermyer, 51 F.3d 319, 326 (2d Cir. 1995)).  The "rationale" for this distinction is that "the crime of conspiracy is complete whether or not the substantive offense which was its object was completed."  Wydermyer, 51 F.3d at 325.

The Indictment goes well beyond these baseline criteria.  Among many other things, it alleges that:

- "[o]nline wagers made through the Betting Companies' online mobile applications were made pursuant to the Betting Companies' respective terms of use . . . [which] generally prohibited users from wagering in connection with sporting contests when the wagers were based on or the users had access to pre-release, confidential information or other non-public information," Ind. ¶ 24;

13

- "the defendants obtained non-public information for the purpose of placing fraudulent bets," id. ¶ 31;

- "the defendants and their co-conspirators placed and caused others to place these fraudulent wagers through the Betting Companies' mobile applications and retail sportsbooks," id. ¶ 32; and

- "[i]n doing so, the defendants and their co-conspirators made and caused others to make materially false and misleading statements and representations to the Betting Companies . . . ," id.

It also provides details concerning the dates, participants, and bets involved in each individual scheme. See, e.g., Ind. ¶¶ 36-43. Given these allegations, the defendant cannot seriously claim he lacks notice of the fraudulent nature of the conspiratorial agreement alleged such that the indictment is rendered defective.

Nor does the defendant's claim that the indictment fails to "descend to particulars" withstand scrutiny of the underlying caselaw. Def. Mot. at 15 (quoting United States v. Pirro, 212 F.3d 86, 93 (2d Cir. 2000)). In Pirro, the defendant was charged under Title 26 with willfully and knowingly making a false tax return based on a failure to disclose a certain corporate relationship. 212 F.3d at 88. The tax regulations at issue required such disclosure from a "shareholder," but the indictment only alleged the defendant had an "ownership interest," which is a broader term than "shareholder" and encompasses categories of people excluded from the regulation. Id. at 89. Thus, the Second Circuit affirmed the dismissal of that count because, by using an overbroad term, the indictment failed to allege the defendant was a shareholder and therefore failed to allege an element of the offense. Id. at 93. Pirro relies on several other cases that stand for the same, non-controversial proposition: an indictment must be specific enough to state a cognizable offense that alleges each element of the crime. See United States v. Hess, 124 U.S. 483, 486 (1888) ("No essential element of the crime can be omitted without destroying the whole pleading."); United States v. Cruikshank, 92 U.S. 542, 557 (1875) (post-Civil War

14

indictment charging defendants with intent to hinder Black U.S. citizens' free exercise of all rights, privileges, and immunities that failed to specify any particular right was insufficiently alleged). The Indictment pleads with sufficient particularity the allegations underlying the government's conspiracy charges.

In service of its claims that the government failed to allege any cognizable misrepresentation or omission, the defendant attempts to downplay the seriousness of the offense by claiming that "the government seeks to impose criminal liability based on defendants' and co-conspirators violations of the Betting Companies' rules." Def. Mot. at 17. This is a vast oversimplification. The rules matter because they are the basis of the defendants' fraudulent misrepresentations to the Betting Companies—every time a co-conspirator bet on inside information, he made a "false or fraudulent pretense[], representation[], or promise[]," 18 U.S.C. § 1343, to the relevant Betting Company, which the trial evidence will prove required certification that bettors were not betting on inside information. See pp. 2-3, supra.

But the crime here is not the technical rule violation—the crime is the agreement among this large group of individuals, including the defendant, to use inside information about upcoming NBA games to defraud the Betting Companies out of their money. Rozier not only provided inside information, but plotted ahead of time to pull himself out of a game and shared that information with co-conspirators—but not his employer who was paying him to play basketball—for the purpose of enabling fraudulent betting. That conduct amounts to a fraudulent—indeed, criminal—scheme, not merely a technical violation of the Betting Companies' terms of use. Cf. United States v. Hunt, No. 05-CR-395 (DAB), 2006 WL 2613754, at *8 (S.D.N.Y. Sept. 6, 2006) ("The Court finds that more than a violation of NYSE rules has been alleged here. As analyzed above, if the Government proves its case against Defendant,

there can be no question that his acts of trading ahead and interpositioning constituted fraudulent acts perpetrated upon the trading public, not mere violations of quasi-regulatory rules.").

  The defendant's reliance on United States v. Chandler, 376 F.3d 1303 (11th Cir.), on reh'g, 388 F.3d 796 (11th Cir. 2004), does not salvage this argument.  In Chandler, many people were charged with participating in a scheme to defraud McDonald's by cheating on its Monopoly promotional game, in which people collected game stamps when they purchased food. Id. at 1306.  An individual who had access to the stamps (the "Embezzler") embezzled winning stamps and had them disseminated across a large network of individuals who then submitted them to McDonald's for the prize money (the "Winners").  Id.  The government conceded the Winners did not know the Embezzler or that he had stolen the stamps; its theory rested on the idea that by submitting the stamps knowing they did not obtain them "legitimately"—i.e., from the wrapper of a Big Mac, Happy Meal, or the like—the Winners had participated in a mail fraud conspiracy.  Id. at 1307.  The government's theory thus rested entirely on the purported violation of the game's rules, which the Eleventh Circuit rejected, since mere breach of contract itself is not a crime.  Id. at 1312.  (Moreover, the trial evidence proved that it was not actually a violation of the rules to transfer stamps for redemption—as government witnesses testified, game stamps were publicly traded, including on McDonald's own website.)

  Needless to say, that case is a far cry from this case.  Redeeming stamps that were given to the defendants rather than obtained from a McDonald's purchase does not make out a scheme to defraud or evidence any sort of corrupt intent.  In contrast, plotting to withdraw from a game early, sharing that information with friends for the purpose of them making successful bets while hiding it from an employer, and knowing that co-conspirators would also be hiding that information from the Betting Companies does.  The knowing deception and coordinated

concealment alleged here place this case squarely outside <u>Chandler</u> and within the heartland of federal fraud.

        d.  <u>The Indictment States a Money Laundering Offense</u>

        The Court should also reject the defendant's arguments in support of dismissing the money laundering conspiracy count. For all the reasons stated above, the wire fraud predicate is legally sound. And the Indictment plainly alleges facts sufficient to inform the defendant of the basis of the charge that he participated in a money laundering conspiracy: the co-conspirators sought to make at least hundreds of thousands of dollars off Rozier's premeditated withdrawal from the March 23 Game, and those profits were in the form of electronic payouts from betting operators, including the Betting Companies. Following the successful bets, Rozier arranged and paid for Laster's travel to collect a kickback originating from those transactions; Laster brought the money back to Rozier; and they counted the stacks of cash together (<u>e.g.</u>, Ind. ¶¶ 42-43). These facts as alleged, coupled with the statutory language, are more than sufficient to make out the basis of a money laundering conspiracy.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the

defendant's motion to dismiss the Indictment should be denied in its entirety.

Dated:   Brooklyn, New York
         February 2, 2026

                                        Respectfully submitted,

                                        JOSEPH NOCELLA, JR.
                                        United States Attorney
                                        Eastern District of New York


                                         /s/
                                        Kaitlin T. Farrell
                                        Benjamin Weintraub
                                        David Berman
                                        Assistant U.S. Attorneys
                                        (718) 254-7000


Cc:    Clerk of the Court (LDH)
       Defense Counsel of Record (By ECF)

18